IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALESIA FLAMENT, | : *Filed electronically* |
| *Plaintiff*, | : |
| v. | : Case No.:2:24-cv-977 |
| ALLEGHENY HEALTH NETWORK and GENERAL HEALTHCARE RESOURCES, LLC f/k/a GENERAL HEALTHCARE RESOURCES, INC., *jointly and severally*, | : |
| *Defendant.* | |

**COMPLAINT IN CIVIL ACTION**

AND NOW, comes Plaintiff, Alesia Flament, by and through the undersigned counsel, J.P. Ward & Associates, LLC, and, specifically, Joshua P. Ward, Esquire, who files the within Complaint in Civil Action against Defendant, Allegheny Health Network, and Defendant, General Healthcare Resources, LLC f/k/a General Healthcare Resources, Inc., of which the following is a statement:

**PARTIES**

1. Plaintiff, Alesia Flament (hereinafter "Plaintiff" or "Ms. Flament"), is an adult individual who currently resides at 3512 Provost Road, Pittsburgh, PA 15227.

2. Defendant Allegheny Health Network (hereinafter "Defendant" or "AHN") is a Pennsylvania nonprofit corporation with a principal place of business at 120 Fifth Avenue, Suite 2900, Pittsburgh, PA 15222.

3. Defendant General Healthcare Resources, LLC. f/k/a General Healthcare Resources, Inc. (hereinafter "Defendant" or "GHR") is a Foreign Limited Liability company with

a principal place of business located at 2250 Hickory Rd., Suite 240, Plymouth Meeting, PA, 19462.

## JURISDICTION AND VENUE

4.	Jurisdiction is proper as this action arises under Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981, *et seq*.

5.	Plaintiff is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 25 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### a. Defendants, AHN and GHR were joint employers of Plaintiff.

6.	While Ms. Flament received paychecks from GHR, she was functionally an employee of AHN as there was a joint-employer relationship between the two Defendants.

7.	Both Defendants participating in hiring and selecting employees to work at AHN, determining compensation, and directing the day to day activities of employees like Plaintiff.

8.	GHR is a corporation that provides healthcare facilities with traveling healthcare professionals to "help make a meaningful difference in the healthcare community." GHR further states "candidates and clients have depended on GHR for insight into the near- and longer-term future of the business[1]."

9.	GHR provided AHN with employees, who in turn were responsible for exercising supervision over the employees, providing them with assignments, and promulgating work rules.

---

[1] https://www.ghrhealthcare.com/about-us/our-approach

10. In determining whether there is a joint employer relationship, such that two different companies can both be held liable under Section 1981for the same alleged misconduct, courts look to the following factors: (1) authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours, (2) day-to-day supervision of employees, including employee discipline, and (3) control of employee records, including payroll, insurance, taxes and the like." *Anderson v. Finley Catering Co., Inc.*, 218 F. Supp 3d 417, 421 (E.D. Pa. 2016). Further, "no single factor is dispositive and a weak showing of one factor may be offset by a strong showing on the other two." *Id*.

11. Thus, both AHN and GHR exercised significant control over Plaintiff's conditions of employment, promulgated work rules and assignments and were involved in day-to-day employee supervision, including employee discipline.

12. In or around June of 2022, Ms. Flament began her employment with GHR contracted as a travel Registered Nurse (RN).

13. Soon after Ms. Flament finished her training with GHR, her first assignment was with AHN.

14. Specifically, Ms. Flament worked in the Emergency Room department at AHN's Allegheny General Hospital, issuing and coordinating patient care, educating and treating various health conditions and providing emergency health services when necessary.

15. At all times relevant, Ms. Flament is an African American individual and was highly qualified to perform the essential functions of her job duties.

  a. **<u>Ms. Flament was subjected to a Racially Hostile Work Environment</u>**

16. Allegheny General Hospital (AGH) and its emergency room serve as a crucial healthcare resource for all communities, including the underserved African American community in and around Pittsburgh. This facility's role is vital in ensuring access to medical care for marginalized populations.

17. Upon information and belief, the Defendants have engaged in a consistent pattern and practice of disparate treatment towards their African American employees, staff, and patients. This history is marked by the Defendants' systematic disregard for the complaints and needs of African American individuals on the basis of their race.

18. Defendants permitted similarly situated white managers, employees, and supervisors to engage in discriminatory practices against African American employees.

19. Among the victims of these overtly discriminatory practices was Ms. Flament, who was subjected to a racially hostile work environment by certain personnel within management, as detailed herein.

20. Throughout her employment with the Defendants, Ms. Flament was subjected to racially disparaging comments from various staff members.

21. On September 24, 2022, a notable incident occurred involving a similarly situated white registered nurse, identified as Ms. Pam (RN). Ms. Pam reported to Ms. Flament regarding a black patient who was experiencing severe pain (rated 9/10) in the umbilical region. Despite the patient's condition, Ms. Pam stated that she did not administer any pain medication because, in her words, "I don't know how much pain she could be in."

22. This incident exemplifies a broader pattern of white registered nurses either neglecting or showing blatant disregard for the pain and concerns of black patients.

23. Further, on October 6, 2022, Ms. Flament witnessed another troubling incident involving a white Emergency Medical Technician (EMT) identified as Mr. Al (RN) and white Registered Nurse Ms. Sadie (RN). They were laughing about a black patient who had been shot in the head. Mr. Al subsequently remarked, "Well, just let him go and tell his mom so she can come in and scream and holler like they [referring to black people] always do."

24. When Ms. Flament confronted Mr. Al about these comments, he dismissively responded, "Oh, I didn't mean it like that."

25. The most pervasive and egregious comments came from another white registered nurse, identified as Ms. Kelly Goedeker (RN). On January 14, 2023, when Ms. Flament informed Ms. Goedeker that she was going on break, Ms. Goedeker laughed and remarked, "You shouldn't say that. You know who always dies first in the scary movies. The black person."

26. On the same day, Ms. Goedeker spoke to Ms. Flament about another black patient, alleging that the patient was going to "screw me over because he was about to fake a seizure," and that there was nothing wrong with him. Ms. Goedeker stated she would administer ammonia salts because the patient was being unresponsive. A review of the patient's medical chart revealed a critically low blood glucose level of 33 mg/dL, indicating a severe medical condition that required immediate attention.

27. The following day, on January 15, 2023, Ms. Flament encountered Ms. Goedeker at the nurses' station. Ms. Goedeker was speaking on the phone with her boyfriend, repeatedly stated, "I hate black people," while laughing. She further declared she was going to make Ms. Flament her "slave." These comments were made in the presence of two other black registered nurses, Ms. Gabrielle Diamond (RN) as well as a black Certified Nursing Assistant, identified as Ms. Shondell (CNA). It is also important to note that Ms. Goedeker's boyfriend is also black.

28. Ms. Goedeker frequently made racially hostile remarks under the pretense of jokes, often justifying her statements by mentioning her African American boyfriend, as if this somehow validated her behavior.

29. These allegations clearly illustrate the racially hostile work environment that Ms. Flament and other similarly situated African American employees were subjected to at AGH. The Defendants' actions not only violated Ms. Flament's rights but also perpetuated a toxic and discriminatory workplace culture.

b. **Ms. Flament complained to management regarding the openly bigoted language and actions of her supervisors and white counterparts**

30. The comments made by Ms. Goedeker became intolerable for Ms. Flament, prompting her to file a complaint on January 16, 2023, with GHR Client Manager Jennifer Erny (hereinafter "Ms. Erny").

31. Ms. Erny documented the incidents and assured Ms. Flament that she would follow up with the management at AHN.

32. On January 17, 2023, Tarah Day (hereinafter "Ms. Day"), Manager of the Emergency Department at AHN, summoned Ms. Flament to her office to discuss the allegations against Ms. Goedeker.

33. During this meeting, Ms. Flament detailed the racially charged comments made by Ms. Goedeker and informed Ms. Day that Ms. Diamond Ms. Shondell were willing to provide written statements regarding the incident. There was another black RN Danielle Sober (hereinafter "Ms. Sober") who was a witness to the racially hostile work environment and was also willing to make comments about what she experienced.

34. At the conclusion of the meeting, Ms. Day expressed her personal views on the appropriate action for Ms. Goedeker's behavior but indicated that she was constrained by procedural requirements.

35. Ms. Day then asked Ms. Flament, "As a white woman, and you a black woman, what can I do to help make it better for you?"

36. Despite this meeting, no disciplinary action against Ms. Goedeker was communicated to Ms. Flament, and Ms. Goedeker continued her employment in the Emergency Department.

37. After speaking with some of the other staff, it was revealed that Ms. Goedeker had been required to undergo multiple educational sessions on diversity and inclusion. Ms. Flament was informed that this was not the first report of racially inappropriate behavior by Ms. Goedeker. There had been previous complaints regarding her treatment of black patients and her frustration with them in the Emergency Department.

38. On January 24, 2023, Ms. Flament received a call from Ms. Day offering her the option to cancel her contract with AHN without any negative repercussions, due to her complaint of a hostile work environment.

39. Ms. Flament conveyed to Ms. Day that leaving would not address the underlying issues of disparate treatment of black patients and the pervasive racism exhibited by Ms. Goedeker and other similarly situated white RNs.

40. Ms. Flament continued to request updates from GHR regarding her complaints against Ms. Goedeker.

41. Unfortunately, Ms. Flament did not receive any resolution or communication from AHN regarding her complaints of a hostile work environment and discrimination.

42. Subsequently, Ms. Flament discussed the matter with her AHN Union Representative, Jain Calvin (hereinafter "Mr. Calvin").

43. Despite this discussion, Mr. Calvin did not initiate any formal complaint procedures and merely suggested that Ms. Flament report the incident to the news media.

### c. Ms. Flament's Termination.

44. On May 4, 2023, Ms. Flament was attending to a patient, an African American woman, who presented to the emergency room with severe ankle pain, rated 10/10. The patient also reported that she was not currently taking any medication.

45. As the patient was recounting the details of her injury to Ms. Flament, Physician Assistant Brea LNU (hereinafter "Ms. Brea") interrupted and took over the conversation with the patient regarding her injury.

46. After Ms. Flament left the patient's room, Ms. Brea informed her that she would place a prescription order and that the patient was otherwise ready for discharge.

47. Ms. Flament proceeded to complete the discharge paperwork. However, upon returning to the patient's room to inform her of the discharge, the patient questioned, "So you are not going to do anything about my pain?" Ms. Flament assured the patient that she would consult with Ms. Brea regarding her pain management.

48. After a prolonged search, Ms. Flament encountered Ms. Brea leaving the patient's room. Ms. Brea stated that the patient had been discharged and commented, "She's not a happy camper."

49. Ms. Flament expressed to Ms. Brea that the patient was still experiencing significant pain and suggested that they provide pain medication before discharging her.

50. Ms. Brea responded, "I gave her an order for naproxen, and she can take Tylenol. Oh well."

51. Naproxen, a common arthritis medication, is available over the counter or in stronger dosages via prescription.

52. This incident epitomizes the disparate treatment African American patients routinely endured at the hands of various white staff members at AHN. Throughout Ms. Flament's tenure at AHN, it was a common practice for the concerns of African American patients to be dismissed or inadequately addressed, resulting in substantially inferior medical care based on race.

53. At approximately 1:00 PM on May 4, 2023, Ms. Flament received a call from Ms. Day requesting her presence in her office.

54. During this meeting, Ms. Day inquired about the incident involving Ms. Brea.

55. The purpose of the meeting was to address a complaint made by Ms. Brea against Ms. Flament, alleging aggressive behavior. Ms. Day noted that other staff members present during the incident had also described Ms. Flament as aggressive.

56. Ms. Flament explained that her actions were driven by her commitment to advocating for the best interests of her patients, ensuring they received appropriate pain management. She expressed regret if her behavior was perceived as aggressive and requested a meeting with Ms. Brea and other staff to discuss and clarify the situation.

57. Ms. Day responded, "Well, you can try fixing your face. That can sometimes send the wrong message."

58. Following the meeting, Ms. Flament sent a text message to Ms. Day seeking to follow up on their discussion and the alleged statements made by other staff members.

59. Specifically, Ms. Flament sought to understand why certain staff members had labeled her as aggressive when she was merely advocating for her patients.

60. In fact, through her own investigation and communications with the other Emergency Department staff, nobody mentioned that they were questioned by Ms. Day regarding the event and nobody that Ms. Flament spoke to referred to her actions as "aggressive."

61. Although Ms. Day read the text message, she did not respond and ignored Ms. Flament for the remainder of the day.

62. Notably, there was a marked difference in the treatment Ms. Flament received when she lodged a complaint. Similarly situated white employees, such as Ms. Brea, received prompt and responsive meetings with Ms. Day upon filing a complaint against Ms. Flament.

63. Conversely, when Ms. Flament raised complaints about her white colleagues, she did not receive comparable attention or support from Ms. Day.

64. Finally, these complaints by Ms. Brea perpetuate the racially hostile work environment that Ms. Flament and others were subjected to, with Ms. Flament being stereotyped as the angry, aggressive black person when she was merely trying to advocate for the needs of patients.

65. On May 8, 2023, Ms. Flament was informed by Ms. Day that her contract had been terminated. Ms. Day cited repeated instances of alleged misconduct and a failure to demonstrate improvement as the reasons for the termination.

66. These allegations underscore the differential treatment and lack of support Ms. Flament experienced in comparison to her white counterparts, highlighting the pervasive discrimination within AHN.

67. The actions of AHN demonstrate a clear pattern of retaliation, lack of responsiveness, and disregard for the hostile work environment endured by Ms. Flament. Despite repeatedly voicing her concerns about racially discriminatory practices and advocating for better treatment of African American patients, Ms. Flament's complaints were met with indifference and dismissiveness. Management, particularly Ms. Day, failed to take meaningful action to address the pervasive racism and instead focused on unfounded allegations of aggression against Ms. Flament. The pretextual termination of Ms. Flament's contract on May 8, 2023, under the guise of alleged misconduct and failure to improve, was a retaliatory act aimed at silencing her and deterring further complaints about racial discrimination. This termination underscores AHN's lack of commitment to fostering an equitable and respectful workplace, highlighting the institution's prioritization of protecting its reputation over addressing serious issues of racial bias and hostile work conditions.

## COUNT I
### RACIAL DISCRIMINATION IN VIOLATION OF SECTION 1981
**(Plaintiff vs. Defendants)**

68. Ms. Flament incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

69. 42 U.S.C. § 1981(a) provides that:

> "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws …as is enjoyed by white citizens."

*Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975) (holding that Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race."); *see also*, *Comcast Corp. v. Natl. Assn. of African Am.-Owned Media*, 140 S. Ct. 1009, 1010 (2020).

11

70. Thus, Section 1981 prohibits employers from engaging in intentional racial discrimination.

71. Defendants were joint employers of Plaintiff as they both exercised significant control over Plaintiff's conditions of employment, promulgated work rules and assignments and were involved in day-to-day employee supervision, including employee discipline.

72. Ms. Flament was an African American employee and was highly qualified for her position.

73. Ms. Flament suffered from adverse employment action when she was terminated for supposed aggressive behavior that she failed to correct.

74. Ms. Goedeker, a similarly situated white co-worker, was not given any form of corrective action or reprimand by Defendants for the blatant racist remarks and the lack of equal treatment for black patients.

75. Furthermore, AHN had a pattern of practice of acting more responsive to the complains and concerns of white employees compared to their similarly situated black counterparts.

76. Specifically, Ms. Flament's complaints against Ms. Brea were ignored by Ms. Day, even though she acted timely and responsive to Ms. Brea's complaints against Ms. Flament.

77. Defendants relied on racist stereotypes of African Americans in determining that Ms. Flament was being aggressive in her merely attempting to advocate for the needs of her patients.

78. On May 8, 2023, Ms. Flament was terminated by Defendants under pretextual reasoning.

79. Defendants' actions against Ms. Flament were undertaken with reckless indifference to her federally protected right to make and enforce contracts irrespective of her race.

80. As a direct and proximate result of the aforementioned conduct, Ms. Flament suffered actual damages, including, but not limited to, lost wages, benefits, emotional distress, anxiety, loss of reputation, loss of professional opportunities, humiliation and severe inconvenience all in the past present and future.

81. As set forth hereinabove, Defendants' actions were intentional, knowing, wanton, willful and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff, Alesia Flament, hereby requests this Honorable Court consider the above and grant relief in her favor and against Defendant, including an award of back pay, front pay, compensatory and punitive damages, costs and reasonable attorney's fees, and any other relief deed just and proper by this Honorable Court.

## COUNT II
## HOSTILE WORK ENVIRONMENT BASED ON RACE
## IN VIOLATION OF SECTION 1981
### (Plaintiff vs. Defendants)

82. Ms. Flament incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

83. The protections established by Title VII include "protection against a hostile work environment that is abusive to an employee on the basis of his or her sex." *Bryant v. Wilkes-Barre Hops., Co., LLC*, 146 F. Supp. 3d 628, 645 (M.D. Pa. 2015).

84. The elements of a hostile work environment under § 1981 are the same as the elements for a hostile work environment claim under Title VII. *Senador v. Zober Industries, Inc.*, No. 07-4144, 2009 WL 1152168, at *9 (E.D. Pa. Apr. 28, 2009) (citing *Ocasio v. Lehiah Valley Family Health Ctr.*, 92 Fed. Appx. 876, 879-80 (3d Cir. 2004)).

85. In order to establish a hostile work environment claim, a plaintiff must show that: "(1) he suffered intentional discrimination because of race and/or national origin; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same protected class in that position; and (5) the existence of vicarious or respondent superior liability." *Id*. (citing *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001)).

86. The United States Supreme Court has held that "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII . . . is violated." *Washington v. Martinez*, No. Civ.A. 03-3529, 2004 WL 632705, at *5 (E.D. Pa. Jan. 28, 2004) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

87. Courts have held that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at *6 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)).

88. Defendants were joint employers of Plaintiff as they both exercised significant control over Plaintiff's conditions of employment, promulgated work rules and assignments and were involved in day-to-day employee supervision, including employee discipline.

89. Ms. Flament faced severe intentional discrimination at work because of her race. Specifically, she was forcibly subjected to racist remarks made by her coworkers and watched as black patients were systemically ignored or disregarded on the basis of their race.

90. Ms. Flament was detrimentally affected by the intentional discrimination, as any reasonable person would have been.

91. Following Ms. Flament's reports of intentional discrimination, Defendants retaliated against Ms. Flament by terminating her employment.

92. Therefore, Defendants permitted, condoned and perpetuated the racially biased hostile work environment which Ms. Flament was forced to endure and therefore deprived her of the same right to make and enforce contracts as is enjoyed by white citizens, in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

93. Defendants' actions against Ms. Flament were undertaken with reckless indifference to her federally protected right to make and enforce contracts irrespective of her race.

94. Defendants' actions were intentional, knowing, wanton, willful and so outrageous as to shock the conscience.

95. As a direct and proximate cause of the aforementioned conduct, Ms. Flament has suffered and continues to suffer damages, including but not limited to lost wages and benefits, anxiety, loss of reputation, lost career opportunities, emotional distress, humiliation and inconvenience.

WHEREFORE, Plaintiff, Alesia Flament, hereby requests this Honorable Court consider the above and grant relief in her favor and against Defendant, including an award of back pay, front pay, compensatory and punitive damages, costs and reasonable attorney's fees, and any other relief deed just and proper by this Honorable Court.

**COUNT III**
**RETALIATION AND WRONGFUL TERMINATION**
**IN VIOLATION OF SECTION 1981**
**(Plaintiff vs. Defendants)**

96. Ms. Flament incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

97. The Third Circuit has held that retaliation claims under § 1981 are controlled by the three-step burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Canada v. Samuel Grossi & Sons*, 49 F.4th 340 (3rd Cir. 2022) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008) (holding that § 1981 "encompasses claims of retaliation")).

98. Under the first step of that framework, a plaintiff "must establish a prima facie case by showing '(1) [that he engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (alteration in original) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

99. Upon making these showings, the employer then, under step two, has the burden of producing evidence that "present[s] a legitimate, non-retaliatory reason for having taken the adverse action." *Daniels*, 776 F.3d at 193. If the employer meets this burden, the burden then shifts "back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id*. (quoting *Moore v. Cty. of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006)).

100. Defendants were joint employers of Plaintiff as they both exercised significant control over Plaintiff's conditions of employment, promulgated work rules and assignments and were involved in day-to-day employee supervision, including employee discipline.

101. Ms. Flament engaged in protected activity when she reported the pervasive racist remarks made by Ms. Goedeker.

102. Ms. Flament suffered from adverse employment action when she was terminated for being aggressive even though she was merely trying to advocate for the needs of her patients.

103. Ms. Goedeker, a similarly situated white co-worker, was not given any form of corrective action or reprimand by Defendants for the blatant racist remarks and the lack of equal treatment for black patients.

104. On May 8, 2023, Ms. Flament was terminated by Defendants under pretextual reasoning.

105. As a direct and proximate cause of the aforementioned conduct, Ms. Flament suffered actual damages, including but not limited to, lost wages, benefits, emotional distress, anxiety, loss of reputation, loss of professional opportunities, humiliation and severe inconvenience, all in the past, present and future.

106. As set forth hereinabove, Defendants' actions were intentional, knowing, wanton, reckless and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff, Alesia Flament, hereby requests this Honorable Court consider the above and grant relief in her favor and against Defendant, including an award of back pay, front pay, compensatory and punitive damages, costs and reasonable attorney's fees, and any other relief deed just and proper by this Honorable Court.

**JURY TRIAL DEMANDED.**

                                  Respectfully submitted,

                                  **J.P. WARD & ASSOCIATES, LLC**

Date: July 5, 2024                    By: _____
                                                  Joshua P. Ward (Pa. I.D. No. 320347)

                                                  J.P. Ward & Associates, LLC
                                                  The Rubicon Building
                                                  201 South Highland Avenue
                                                  Suite 201
                                                  Pittsburgh, PA 15206

                                                  *Counsel for Plaintiff*